IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| LESTER JACKSON and | ) | |
| NANCY JACKSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 3:05-CV-231 |
| | ) | |
| TENNESSEE DEPARTMENT OF | ) | |
| SAFETY, an agency of the State of | ) | |
| Tennessee, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

This civil action is before the court for consideration of "Defendant Larry

Rucker's Motion for Summary Judgment" [doc. 67] and the "Motion for Summary Judgment

and/or for Judgment on the Pleadings on Behalf of Defendant Charles Laxton" [doc. 76].[1]

The parties have each filed responses to the respective motions. The court has determined

that oral argument is unnecessary, and the motions are ripe for the court's determination.

For the reasons stated herein, both motions will be granted. Therefore, this

civil action will be dismissed.

---

[1] Larry Rucker and Charles Laxton are the only two remaining defendants in this lawsuit.

## I.

*Background*

Lester Jackson began working for the Tennessee Highway Patrol ("THP") as a trooper in 1974. He was promoted to Sergeant in 1982, Lieutenant in 1990, and Captain of the Knoxville District in 2001. Captain is an executive service level rank, and a Captain serves at the pleasure of the Commissioner of the Tennessee Department of Safety. When the administration changed upon the election of Governor Bredesen in 2002, Jackson was not retained as Captain of the Knoxville District. Laxton became Captain of the District on February 3, 2003, and Jackson accepted a position as a road Lieutenant in the Knox County District.

While Jackson was Captain of the Knoxville District, he was the supervisor of Lieutenant Charles Bryan Farmer between June 1, 2001, and January 31, 2003. By May 4, 2004, disciplinary proceedings involving Farmer had been ongoing for several months. [2] He had been charged with several violations, some involving allegations that he engaged in secondary employment for pay while he was on paid sick leave, a violation of a General Order. Farmer admitted working the secondary employment at his Level III Due Process hearing on February 4, 2004, but he did not mention that he had been given permission to do so by his supervisor Jackson.

---

[2] During the time when the events that led to this lawsuit and Farmer's disciplinary proceedings, a pervasive political atmosphere existed at the THP. The Governor indicated that his goal was to remove politics from the THP, and he ordered a review of THP management procedures.

2

On May 3, 2004, Jackson executed an affidavit in which he states that he gave Farmer permission to fill in for Sergeant Baird, whose father was gravely ill, to teach driver safety classes while on paid sick leave.[3] Larry Rucker, who was conducting the Internal Affairs investigation of Farmer, states in his affidavit that it was only on or about May 4, 2004, through this affidavit that he first became aware that Jackson might have given Farmer permission to work secondary employment while on sick leave, which itself was a violation of a General Order. Jackson testified in deposition that he had been approached by Farmer several weeks prior to doing the affidavit concerning Jackson's having given Farmer permission to perform the employment. Jackson did not come forth with the information until he provided the affidavit on May 3, 2004. Farmer's Level IV Due Process hearing was scheduled for May 5, 2004.

The next morning after executing the affidavit, Jackson informed Laxton about the affidavit so the THP would not be blind-sided by it. Laxton sent a memo to Rucker informing him about what Jackson had done. Jackson soon received a phone call telling him to appear at Rucker's office at 8:00 a.m. on May 5, 2004, to answer questions about the affidavit. Jackson testified in a deposition that prior to the interview he was threatened with criminal prosecution for impeding the Farmer investigation and also with the loss of his retirement. Jackson was interviewed extensively by Rucker and Special Agent Chris Kemp of Internal Affairs on May 5, 2004, regarding his affidavit and his giving Farmer permission

---

[3] The contents of the affidavit are set out in the analysis portion of the court's opinion.

to work secondary employment for pay while on sick leave. Jackson said he had given permission because of the family circumstances involving Baird's father being in the hospital.

Jackson received an anonymous letter dated May 12, 2004, which was opened by Nancy Jackson when it was received at their home. The letter strongly suggested that Jackson back off helping Farmer or Jackson's "lieutenant's bar may very well be laying in a desk drawer somewhere next to the one Farmer used to wear." There is no proof at all in the record who sent the letter to Jackson. There is affirmative testimony from both Rucker and Laxton denying any involvement with the letter, and there is no proof to contradict this testimonial evidence.

On May 24, 2004, Jackson was told to attend a second interview with Rucker. Rucker questioned Jackson briefly about Jackson's own secondary employment and gave him the opportunity to change or add anything to his interview given on May 5, 2004. Jackson did not change anything. After the interview, Rucker informed Jackson he had to take a voice stress test. Jackson took and passed the test.

Jackson retired at the end of September 2004 after returning from medical leave. At the time of his retirement, he was still working as a road Lieutenant. No disciplinary proceedings were pending against him, and he had not had any further interviews or contact with Rucker or Laxton regarding his affidavit since the interviews he had given in May. Jackson did not experience any loss in his retirement benefits, and he retired as a

4

Lieutenant. There is proof in the record that Jackson had a business opportunity lined up upon his retirement which he did in fact pursue. Jackson, however, contends that he was constructively discharged.

## II.

*Summary Judgment Standard* [4]

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party may discharge its burden by demonstrating that the non-moving party has failed to establish an essential element of that party's case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party need not support its motion with affidavits or other materials negating the opponent's claim. *Id.* at 323. Although the moving party has the initial burden, that burden may be discharged by a "showing" to the district court that there is an absence of evidence in support of the non-moving party's case. *Id.* at 325 (emphasis in original).

---

[4] Defendant Laxton's motion has also been brought as a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). However, under a Rule 12(c) motion, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Defendant Laxton has submitted considerable documentation outside the pleadings in support of his motion, and the court will therefore treat and analyze his entire motion as one for summary judgment under Rule 56.

5

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

## III.

### *Analysis*

### <u>Charles Laxton's Motion to Strike</u>

Before addressing the merits of Laxton's motion for summary judgment, the court must first consider his motion to strike. Laxton has moved to strike four of the five exhibits plaintiffs attached to their response to his motion for summary judgment. Laxton has also moved to strike a number of the exhibits plaintiffs attached to their response to

6

Rucker's motion for summary judgment because they incorporated that response into their response to Laxton's motion for summary judgment as well. Before addressing the specific documents that have been challenged, the court needs to consider several other issues raised by the motion to strike.

Plaintiffs respond by arguing that a motion to strike under Rule 12(f) is not the correct procedural device to challenge the exhibits used in response to a summary judgment motion as only pleadings can be stricken by such a motion and exhibits are not pleadings. Laxton argues that he has not filed his motion under Rule 12(f) and that his motion to strike exhibits has been confused with a motion to strike pleadings.

While Laxton does not identify a specific Rule under which he brings his motion, motions to strike are governed by Fed. R. Civ. P. 12(f). *See Lombard v. MCI Telecomms. Corp.*, 13 F. Supp. 2d 621, 625 (N.D. Ohio 1998). Rule 12(f) provides that a court "may strike from *a pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f) (emphasis added). Rule 7(a) defines a "pleading" as:

> (1)     a complaint;
> (2)     an answer to a complaint;
> (3)     an answer to a counterclaim designated as
>          a counterclaim;
> (4)     an answer to a crossclaim;
> (5)     a third-party complaint;
> (6)     an answer to a third-party complaint; and
> (7)     if the court orders one, a reply to an
>          answer.

7

Fed. R. Civ. P. 7(a).

"An affidavit is not a pleading that is subject to a motion to strike under Rule 12(f)." *Scott v. The Dress Barn, Inc*., No. 04-1298-T/AN, 2006 WL 870684, at *1 (W.D. Tenn. Mar. 31, 2006) (citations omitted). "Exhibits attached to dispositive motions are not 'pleadings' within the meaning of Fed. R. Civ. P. 7(a) and are therefore not subject to a motion to strike under Rule 12(f)." *Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006); *see also Rouse v. Caruso*, No. 06-CV-10961-DT, 2007 WL 209920, at *2 (E.D. Mich. Jan. 24, 2007) ("neither . . . motions nor responses to motions constitute 'pleadings' subject to Rule 12(f).") (citations omitted). "While some courts have utilized rule 12(f) to strike affidavits offered in support of summary judgment, there is no basis in the Federal Rules of Civil Procedure for doing so. Rule 12(f) is limited to pleadings and is inapplicable to other filings." *Turner v. City of Akron*, No. 5:06CV3023, 2008 WL 45376, at *4 (N.D. Ohio Jan. 2, 2008) (internal quotation marks and citations omitted).

Although it is inappropriate to strike affidavits and exhibits from the record, the court may disregard such filings if they are inadmissible for some reason. *See Lombard*, 13 F. Supp. 2d at 625 ("[A] court should '*disregard*' inadmissible evidence, not strike that evidence from the record.") (emphasis in original, citations omitted); *see also Fox*, 173 F. App'x 372 (district court properly did not strike exhibits attached to dispositive motion but declined to consider them as they failed to meet the requirements of Fed. R. Civ. P. 56(e)). The court will not strike any of the exhibits challenged by Laxton from the record. However,

8

the court will examine each document and determine if it meets the requirements of Rule 56(e) and the standards for relevance and admissibility. The court will exclude from consideration those exhibits that do not meet the proper admissibility or evidentiary standards.

The court at this point must correct plaintiffs' misconception as to the standard of proof required by Rule 56(e). Plaintiffs are incorrect when they say "the disputed material in question does not have to be admissible but only needs to meet the burden to be reasonably calculated to lead to admissible evidence." Rule 56(e) states in pertinent part:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.

"[The Sixth Circuit] has ruled that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993) (citations omitted); *see also* 10A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure* § 2722, at 379-80 & 382-84 (1998) ("Rule 56(e) requires that sworn or certified copies of all papers referred to in an affidavit must be attached to or served with that affidavit. . . . To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."). "[I]t is well settled that only admissible evidence may be

9

considered by the trial court in ruling on a motion for summary judgment." *Smoot v. United Transp. Union*, 246 F.3d 633, 649 (6th Cir. 2001) (citing *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994)); *see also Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) ("[E]vidence submitted in opposition to a motion for summary judgment must be admissible." (citation omitted)). "Unauthenticated documents may not be used to support a motion for summary judgment." *Davis v. Mich. Dep't of Corrs.*, No. 1:07-CV-200, 2008 WL 1820926, at *2 (W.D. Mich. April 4, 2008) (citing *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994); *Moore v. Holbrook*, 2 F.3d 697, 698-99 (6th Cir. 1993); *Fox v. Mich. State Police* Dep't, 173 F. App'x 372, 375 (6th Cir. 2006)).

Plaintiffs also argue that somehow Laxton cannot challenge the exhibits attached to their response because he has alternatively brought a motion for judgment on the pleadings. This argument is without merit. As referenced above, the court is treating Laxton's entire dispositive motion as a motion for summary judgment because of the considerable documentation outside the pleadings offered in support of the motion. Fed. R. Civ. P. 12(d).

Finally, the court needs to address plaintiffs' request that the court take judicial notice of the entire Bryan Farmer case, *Farmer v. Tennessee Department of Safety*, No. 3:05-CV-84. Both Rucker and Laxton object to the request. For the reasons that follow, the court will not take judicial notice of the entire *Farmer* file.

10

Federal Rule of Evidence 201 governs judicial notice and provides in pertinent part:

> (a)    This rule governs only judicial notice of adjudicative facts.
>
> (b)    A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
>
> (c)    A court may take judicial notice, whether requested or not.
>
> (d)    A court shall take judicial notice if requested by a party and supplied with the necessary information. . . .

Fed. R. Evid. 201.

The court certainly acknowledges that the *Farmer* proceeding occurred. However, that case contains 228 docket entries, volumes of documents that unquestionably contain matters subject to reasonable dispute, hearsay, and that are irrelevant or inadmissible for any number of reasons. Plaintiffs have not identified and attached specific documents from the *Farmer* file which they want judicially noticed by the court. As one court faced with a similar circumstance stated:

> [T]he court will not rummage through the Court files and take notice of those documents requested absent those documents being supplied to the Court. It is not this Court's function to lay a record for the lawyers involved in this case.

*In re Tyrone F. Conner Corp.*, 140 B.R. 771, 782 (Bankr. E.D. Cal. 1992).

11

In this case, the plaintiffs have not even identified specific documents they want judicially noticed. They basically want the court to take notice of an entire file to help boot strap their summary judgment response and create material issues of fact.

Plaintiffs cite in support of their request *United States v. Doss*, 563 F.2d 265 (6th Cir. 1977) and *Reeves v. Jensen*, No. 5:04-CV-194, 2007 WL 1464260 (W.D. Mich. May 17, 2007) for the proposition that a court can take judicial notice of its own record. In *Doss*, the Sixth Circuit took judicial notice of the joint appendix in two cases related to the one before it. In *Reeves*, the district court took judicial notice of the many other lawsuits filed by the plaintiff, a self-described "prolific litigator." These factual circumstances are in no way similar to the manner in which plaintiffs herein want to use the *Farmer* file to counter a summary judgment motion. The *Farmer* case, though related to this action, is a separate and voluminous lawsuit. If there are specific adjudicative facts from that file that plaintiffs want the court to take judicial notice of, they should provide those specific facts for the court's review. They have not done so. The court, therefore, declines plaintiffs' request.

The court will now address the documents that Laxton seeks to exclude. [5] As referenced above, evidence used to support or oppose a motion for summary judgment must

---

[5] Laxton has identified the documents at issue by a document page number rather than by the exhibit number given by plaintiffs, and not all the documents objected to by Laxton are described. It would have been preferable and clearer if the actual exhibit number had been used as the exhibit numbers differ from the document page numbers. For example, doc. 106-3 is plaintiffs' exhibit 2; doc. 99-2 is plaintiffs' exhibit 1. The court docket sheet identifies the attachments to plaintiffs' response as numbered exhibits, and Laxton is seeking to exclude those exhibits. Therefore, the court will identify the challenged document by both the document page number and corresponding exhibit number.

be properly authenticated and admissible. Laxton has objected to many of plaintiffs' exhibits because they are not authenticated. The court has reviewed the exhibits and has determined that certain documents will be excluded from the court's consideration.

The following exhibits are not properly authenticated pursuant to the standard required by Rule 56(e) and will not be considered by the court when ruling on Laxton's motion for summary judgment:[6] Doc. 106-3 (Ex. 2); Doc. 99-2 (Ex. 1); Doc. 99-5 (Ex. 4); Doc. 99-6 (Ex. 5); Doc. 99-7 (Ex. 6); Doc. 99-8 (Ex. 7); Doc. 99-9 (Ex. 8); Doc. 99-10 (Ex. 9); Doc. 99-11 (Ex. 10); Doc. 99-12 (Ex. 11); Doc. 99-13 (Ex. 12); Doc. 99-15 (Ex. 14); Doc. 99-18 (Ex. 17); Doc. 99-19 (Ex. 18)[7]; Doc. 99-20 (Ex. 19); Doc. 99-21 (Ex. 20); and Doc. 99-22 (Ex. 21).

The following documents have been authenticated and will be considered by the court when ruling on Laxton's motion for summary judgment to the extent they are relevant: Doc. 106-2 (Ex. 1); Doc. 106-4 (Ex. 3); and Doc. 106-5 (Ex. 4).

---

[6] Rucker did not object to the unauthenticated exhibits attached to plaintiffs' response to his motion for summary judgment. "If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994).

[7] A correctly dated copy of this memorandum is attached to an affidavit submitted by Laxton [doc. 72, Ex. 1].

13

## Charles Laxton's Motion for Summary Judgment

<u>Nancy Jackson's Claims</u> [8]

Laxton has moved for summary judgment on Nancy Jackson's claim that her constitutional rights were violated. Under Sixth Circuit law, a § 1983 cause of action is personal to the injured party of an alleged constitutional tort. *See Jaco v. Bloechle*, 739 F.2d 239, 243 (6th Cir. 1984); *see also Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000) (and cases cited therein). There is no cause of action for witnessing the violation of the constitutional rights of another. *Coon v. Ledbetter*, 780 F.2d 1158, 1160-61 (5th Cir. 1986). Only the allegedly injured party or his or her estate representative may prosecute a § 1983 claim. *Claybrook*, 199 F.3d at 357.

Nancy Jackson was not employed by the Tennessee Department of Safety, so there is no allegation that any adverse action was taken regarding her employment. There is no evidence in the record that she had contact with Laxton. When asked in her deposition to provide an example of what Laxton had done to her, she replied, "[H]e was part of it." While she opened the anonymous letter, which upset her, it was addressed to her husband. In addition, there is no proof in the record to establish that Laxton sent the letter. In fact, the identity of the sender has never been discovered. Nancy Jackson has not presented any evidence to demonstrate that her constitutional rights were violated. Her claim is clearly based on her husband's § 1983 claim, which is not permissible under Sixth Circuit law.

---

[8] Nancy Jackson's loss of consortium claim has already been dismissed by a memorandum opinion and order entered February 1, 2006 [docs. 33, 34].

Therefore, Laxton will be granted summary judgment on Nancy Jackson's § 1983 claims.

Lester Jackson's Claims

*Qualified Immunity*

Laxton contends that he is entitled to qualified immunity and has moved for summary judgment on that basis. Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "This immunity shields officials 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Perez v. Oakland County*, 466 F.3d 416, 426 (6th Cir. 2006) (quoting *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005)). Lester Jackson has the burden of demonstrating that Laxton is not entitled to qualified immunity. *See v. City of Elyria*, 502 F.3d 484, 491 (6th Cir. 2007) (citing *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).

In evaluating whether an official or officer is entitled to qualified immunity, the court undertakes a two-part analysis: "(1) whether, considering the allegations in the light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Elyria*, 502 F.3d at 491 (quoting *Swiecicki v. Delgado*, 463 F.3d 489, 497-498 (6th Cir. 2006)). "The focus of the inquiry is not whether the claimed

15

constitutional right was established on a general level, but whether on the specific facts of the case reasonable officials could disagree on whether the particular conduct under scrutiny violated the Constitution." *Gratsch v. Hamilton County*, 12 F. App'x 193, 202 (6th Cir. 2001) (citing *Anderson v. Creighton,* 483 U.S. 635, 640-41 (1997)).

Jackson contends that the actions that were initiated and that ultimately led to his leaving the THP were in retaliation for his exercising his First Amendment rights of free speech and political affiliation.

> In order to establish retaliation for engaging in constitutionally protected activity, a plaintiff must prove the following elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two - that is, the adverse action was motivated at least in part by the plaintiff's protected conduct."

*Sowards v. Loudon County,* 203 F.3d 426, 431 (6th Cir. 2000) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

### 1. First Amendment Speech

The court will initially address the First Amendment speech claim in the context of qualified immunity. The qualified immunity inquiry begins with a determination of whether a constitutional right has been violated. With regard to his First Amendment speech claim, as a public employee, Jackson must first show that his speech is protected. *Elyria*, 502 F.3d at 492 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)). "To

16

accomplish this, the employee must show that his speech touches on a matter of public concern." *Elyria,* 502 F.3d at 492. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. The Sixth Circuit has stated that "[a] matter of public concern usually involves a matter of political, social, or other concern to the community." *Jackson v. City of Columbus*, 194 F.3d 737, 746 (6th Cir. 1999) (abrogated on other grounds). "In general, speech involves matters of public concern when it involves 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'" *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)). "[M]atters of public concern are to be contrasted with internal personnel disputes or complaints about an employer's performance." *Brandenburg*, 253 F.3d at 898.

Whether a plaintiff's speech touches on a matter of public concern is a question of law. *Barnes v. McDowell*, 848 F.2d 725, 733 (6th Cir. 1988). If the speech does involve a matter of public concern, the court must then determine whether the plaintiff's interest in commenting on the matter outweighs the employer's interest in providing efficient and effective services. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968); *see also Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003).

17

Jackson's First Amendment claim is based upon the affidavit he submitted in connection with Bryan Farmer's disciplinary proceedings. He contends that he was retaliated against because he submitted the affidavit. Farmer was charged with violation of a General Order, working secondary employment while on sick leave. As Farmer's supervisor at the time of the alleged violation, Jackson submitted the affidavit, which reveals that he had given Farmer permission to perform the secondary employment. The affidavit states in pertinent part as follows:

<u>AFFIDAVIT OF LESTER JACKSON, LIEUTENANT
TENNESSEE HIGHWAY PATROL</u>

1.      My name is Lester Jackson.

2.      I am employed by the Tennessee Highway Patrol. At the current time, I hold the position of Lieutenant. Prior thereto, I was the District Captain for the Knoxville District.

3.      I am aware that Bryan Farmer is charged with violation of General Order No. 250 covering secondary employment. During the time period for which Lieutenant Farmer worked secondary employment teaching a safety education course in Loudon County, Tennessee, and Morgan County, Tennessee, another Sergeant of the Tennessee Highway Patrol, Don Baird, was having some serious family medical difficulties with his father.

4.      I am aware that Sergeant Baird had a contract with East Tenn [ ] requiring him to conduct these traffic safety education courses. I am also aware that lieutenant Farmer had a contract with Loudon and Morgan counties requiring him to conduct traffic safety education courses.

5.     During the material times hereto, Lieutenant Farmer contacted me and requested permission to fill in for Sergeant Baird, although Lieutenant Farmer was on administrative sick leave.

6.     I gave Lieutenant Farmer permission to teach these classes due to the extenuating circumstances suffered by Sergeant Baird's family, with their extraordinary medical circumstances. In extending this permission, I considered the fact that the classes did not require any extensive physical activity to be exerted on behalf of Lieutenant Farmer. It was purely an administrative and compassionate decision. At no time was there any [] to defraud the state of time, money or service.

The court concludes that Jackson cannot establish a First Amendment retaliation claim based on this affidavit because this speech is not a matter of public concern. Nothing in the subject affidavit reflects "political, social, or other concern to the community." *Jackson*, 194 F.3d at 746. The memo involves an internal employment issue and was generated for use in Farmer's administrative disciplinary proceeding. The affidavit was not published to the press or circulated to the general citizenry. Even if it were, it contains nothing of public interest or concern that would benefit or assist members of society to make decisions about their government. *Brandenburg*, 253 F.3d at 898. The purpose of the affidavit was to clarify an issue in Farmer's disciplinary proceeding, and the affidavit was clearly directed only to those involved in Farmer's administrative proceedings. It involved purely the clarification of a personnel matter, not an issue of community concern.

In evaluating Jackson's affidavit, the court also considered *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and the two recent Sixth Circuit cases that applied and

19

followed *Garcetti*, *Haynes v. City of Circleville*, 474 F.3d 357 (6th Cir. 2007) and *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538 (6th Cir. 2007).

In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. The plaintiff in *Garcetti*, Ceballos, was a deputy district attorney who at the relevant time was a calendar deputy, a position that gave him supervisory capacity over other deputies. A defense attorney informed Ceballos that a critical error had been made in a search warrant involving his client, and Ceballos performed an investigation. He determined that there were misrepresentations in the warrant and wrote a memorandum to his supervisor recommending dismissal of the case. Ceballos claimed the District Attorney's Office retaliated against him, and he sued the District Attorney's Office for First Amendment retaliation after losing his internal grievance. The Supreme Court rejected Ceballos' claim and determined that "[t]he controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy." *Id.*

The circumstances in this case are similar to *Garcetti* in that Jackson was certainly speaking pursuant to his official capacity as Farmer's former supervisor and as a current Lieutenant in the THP, which gave him the authority to attempt to exonerate Farmer. However, this case is somewhat distinguishable from *Garcetti* in that the affidavit here, unlike the memo in *Garcetti*, was not done in the course of Jackson's job duties because it

20

was requested by an investigator working on behalf of Farmer's attorney as a way to assist in the defense of Farmer's disciplinary proceedings.

Thus, Jackson has not shown that his speech touches on a matter of public concern. Therefore, no further inquiry is required. *Barnes v. McDowell*, 848 F.2d 725, 733 (6th Cir. 1988) ("If the plaintiff's speech did not address a matter of public concern, no further inquiry is necessary."); *see also Florio v. Skorepa*, No. 93-4174, 1995 WL 325711, at *2 (6th Cir. May 30, 1995) (citing *Barnes*).

However, even if Jackson had been able to demonstrate that he engaged in protected activity and had thus successfully shown the first prong of his First Amendment speech retaliation claim, he has not demonstrated that any adverse action was taken against him.

Jackson informed Laxton about his execution of the affidavit the day before Farmer's Level IV hearing was scheduled. Laxton has stated in his affidavit that he prepared a memo to Rucker who was head of Internal Affairs about what Jackson had told him. Jackson was interviewed by Internal Affairs twice as a result of his involvement in the Farmer case, May 5 and May 24, 2004. Jackson retired in September 2004. He contends for the first time in response to the motions for summary judgment that he was constructively discharged. The court does not agree.

"A constructive discharge is an 'adverse action' for purposes of the second prong of a prima facie First Amendment retaliation case." *Harris v. Sodders*, No. 07-4398,

2009 WL 331633, at *3 (6th Cir. Feb. 11, 2009). In *Logan v. Denny's, Inc.*, 259 F.3d 558 (6th Cir. 2001), the Sixth Circuit addressed the meaning of the term "constructive discharge."

> To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit. . . . To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined.

*Id.* at 568-69 (internal quotation marks and citations omitted). In *Logan*, the Sixth Circuit set forth factors a court should consider when determining whether an employer has created working conditions that a reasonable person would consider intolerable. The Court stated:

> Whether a reasonable person would have [felt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)). The list of factors is not exclusive. *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005) (citing *Logan*, 259 F.3d at 570). Jackson has the burden of demonstrating that he was constructively discharged.

> [I]n order to show that [he] suffered a constructive discharge, Plaintiff ha[s] to come forward with evidence to demonstrate that the working conditions under which [he] labored were so

22

difficult that a reasonable person standing in [his] shoes would have felt compelled to resign; and that Defendant intended to cause Plaintiff to resign or that [his] resignation was a reasonably foreseeable consequence of Defendant's actions.

*Logan*, 259 F.3d at 567.

Furthermore, "resignations and retirements are presumed to be voluntary. An apparently voluntary resignation does not rise to the level of constructive discharge unless it is objectively reasonable for the employee to leave under the circumstances." *Nunn v. Lynch*, 113 F. App'x 55, 59 (6th Cir. 2004) (citations omitted). The court notes that Jackson's retirement papers indicated that he was recommended for rehire if he chose to return.

Jackson does not allege that his salary was reduced, that he was reassigned, or that he was offered early retirement or continued employment on less favorable terms. He testified that after the interviews with Internal Affairs, he was never informed that there would be any disciplinary actions taken against him. He claims that he left because, "as things were, you didn't know what was going to happen the very next day or when the hatchet was going to fall, or if it was going to happen." He also stated in his deposition:

I thought that was the best thing to do based upon what had taken place. Because I didn't know what tomorrow as going to bring. It was in my mind that the hatchet could fall at any time. I mean, if they wanted to find something that I did wrong, they could find it. I don't know what it would be.

However, this falls short of constructive discharge. Jackson has not presented evidence to support this objective fear. In addition, the fact that other officers had retired under different circumstances, does not in and of itself support Jackson's voluntary

23

retirement. "An employee has an obligation not to assume the worst, and not to jump to conclusions too fast." *McFarland v. Henderson*, 312 F. Supp. 2d 918, 923 (N.D. Ohio 2004) (quotation marks and citations omitted). Additionally, the source of the anonymous letter has never been identified, so that cannot be linked to any action by Laxton or Rucker as harassment to get Jackson to leave.

Furthermore, the fact that Jackson was interviewed in connection with Farmer's case after giving the affidavit is not an adverse employment action. *Driggers v. City of Owensboro*, 110 F. App'x 499, 508 (6th Cir. 2004) ("The fact that [plaintiff] was interviewed pursuant to the Palmer investigation or pursuant to the four EEO complaints she herself filed is not an adverse employment action."). Under the circumstances and timing of Jackson's affidavit in relation to the advanced stage of Farmer's disciplinary proceedings, it was not surprising that Internal Affairs questioned the sudden appearance of Jackson's explanation and its veracity. Jackson was stating in an affidavit that he gave Farmer permission to violate a General Order, at a time when Farmer's disciplinary proceedings had been ongoing for some time. The court has listened to the audio portion of the interviews and finds nothing inappropriately threatening in either interview. In any event, Jackson must show an actual violation of a constitutional right not a threat to his rights in order to obtain redress under § 1983. *Macko v. Byron*, 760 F.2d 95, 97 (6th Cir. 1985).

Moreover, there is no showing that Laxton had the definitive authority to terminate Jackson. As a Lieutenant, Jackson held a civil service rank. He therefore had

procedural safeguards available to him, a fact he certainly was aware of based on his involvement with Lieutenant Farmer's civil service proceedings. *Sodders*, 2009 WL 331633, at *3 ("Sodders could not terminate Harris's employment without the procedural safeguards provided to her as a civil service employee, which she must have been aware of."); *cf. Driggers*, 110 F. App'x at 507 ("It does not follow, however, that Driggers' only alternative at that point was to resign. . . . [I]t was speculative for her to conclude that the inevitable result of disciplinary charges before the City Commission would be her termination. By state law, Driggers could not be dismissed or disciplined without first, the formal filing of charges against her; and second, a hearing before the City Commission, which would have had to decide whether Driggers was guilty of the charged misconduct and then impose the appropriate penalty.").

Jackson has simply failed to demonstrate the necessary elements for constructive discharge. He has presented no proof of intolerable working conditions deliberately created by his employer nor has he shown that any such conditions were designed with the intention to force him to quit. Thus, Jackson has also failed to demonstrate an adverse action taken against him, the second element of his prima facie case of First Amendment speech retaliation against Laxton. Therefore, this claim fails. The court does not need to discuss qualified immunity regarding this claim any further since there has been no constitutional violation.

## 2. Political Affiliation

Jackson also contends that he was retaliated against based upon his First Amendment right of political association. To be successful on this claim, Jackson must demonstrate the same elements as set forth above for his First Amendment retaliation protected speech claim. *Sowards v. Loudon County,* 203 F.3d. 426, 431 (6th Cir. 2000).

Again, the qualified immunity analysis begins with a determination of whether a constitutional violation has occurred. Jackson must first demonstrate that he engaged in protected conduct. "The right of political association is a well established right under the First Amendment for political belief and association constitute the core of those activities protected by the First Amendment. Support of a political candidate falls within the scope of the right of political association." *Id*. at 432 (quotation marks and citations omitted).

Jackson was asked in his deposition about his political activity. While he stated that he had put signs up and attended fund raisers, he did not identify the candidate for whom he did this or when he did this. He testified that the last time he contributed money to a political candidate was in 1994 when he gave money to Sundquist for some dinner tickets. He testified that he has voted for candidates from both political parties and that he does not live and breathe politics. Jackson also stated that he is not a registered member of the Republican party.

Jackson was also asked in his deposition about whether he discussed politics with Laxton. The following exchange occurred:

Q. Did you ever talk to Charles Laxton about who you supported or didn't support for governor when Bredesen ran for governor the first time?

A. Who I supported?

Q. Yes. Did you ever talk to Charles Laxton about that?

A. I don't think that me and Charlie talked about that.

Q. Any way he would know who you supported or didn't support for governor in the 2000 election or I guess 2002 election?

A. I don't think that he would know for sure, but he would know that I didn't support the Bredesen people, because he was familiar with everybody that contributed to the campaigns up here. He worked hard in that campaign and I think he would know.

Q. He would know everybody that contributed?

A. I think that he would know if I did or not, because I worked the same place he did.

Q. Did he ever talk to you about that?

A. No.

Q. Did he ever talk to you about that after he became captain, about who you had supported or why you hadn't supported Bredesen or mention anything about it at all?

A. No, we didn't have any conversations about that.

In the affidavit he submitted in support of his motion for summary judgment,

Laxton stated as follows:

I do not know who Lester and Nancy Jackson supported in the 2002 gubernatorial election. I never discussed Lester or Nancy's political affiliation or mentioned anything about their support or lack of support for any gubernatorial candidate to Internal Affairs Division of the THP or to any other officer in the THP. No officer or other individual in the Internal Affairs Division ever raised the subject with me of Lester or Nancy Jackson's political affiliations or support for any particular candidate nor was this subject raised with me or in my presence by any other individual involved in investigation, charges, or hearings of the Charles Bryan Farmer disciplinary violations.

Jackson has not submitted an affidavit that challenges any portion of this statement.

The record does not support a finding that Jackson engaged in protected conduct by supporting a political candidate. He did not testify that he attended fund raisers, put up signs, posted bumper stickers, or openly campaigned in any way for the Republican candidate running against Bredesen. The most he said was that he did not support Bredesen, i.e. he must not have voted for him. Jackson could not definitely say Laxton knew that he, Jackson, did not support Bredesen. In addition, Laxton's affidavit testimony that affirmatively states he did not know who Jackson supported in the 2002 gubernatorial race stands uncontested. The court concludes that Jackson did not engage in protected conduct in the form of political association.

However, even if it is assumed for the purposes of argument that Jackson engaged in protected political association, he cannot demonstrate the second prong of his prima facie case, that an adverse action was taken that would deter a person of ordinary firmness from continuing to engage in that conduct. *Sowards*, 203 F.3d. at 431. As

28

discussed above, Jackson has not demonstrated that any adverse employment action was taken against him. Therefore, as with his First Amendment speech claim, his political association claim against Laxton fails at the prima facie stage. Because Jackson has not shown that a constitutional violation occurred, the court does not need to proceed further with the qualified immunity analysis.

## Larry Rucker's Motion for Summary Judgment

<u>Nancy Jackson's Claims</u>

Rucker has moved for summary judgment on Nancy Jackson's claim that her constitutional rights were violated. Rucker's motion indicates that it is undisputed that he never interviewed or spoke with Nancy Jackson in any capacity and that she was never an employee of the DOS. She has also not presented any constitutionally protected speech.

As discussed above, pursuant to Sixth Circuit law, a § 1983 cause of action is personal to the injured party. *Jaco v. Bloechele*, 739 F.2d 239, 243 (6th Cir. 1984). Nancy Jackson has not presented evidence that her constitutional rights have been violated by Rucker. Her claim is based entirely on her husband's § 1983 claim, which is not permitted. Accordingly, Rucker will be granted summary judgment on Nancy Jackson's § 1983 claims.

Lester Jackson's Claims

*Qualified Immunity*

Rucker contends that he is entitled to qualified immunity. As discussed in the analysis of Laxton's claims, the court will first determine if a constitutional violation has occurred.

1. First Amendment Speech

Jackson also contends that Rucker violated his first amendment speech rights by retaliating against him in connection with the affidavit submitted in support of Bryan Farmer. As the court has already found, this affidavit does not touch upon a matter of public concern and is not protected speech.

However, even if it were, Jackson again cannot demonstrate that an adverse action was taken against him. Jackson contends that the interviews and the tone taken in the interviews somehow violated his rights. As noted above, the fact that he was interviewed is not an adverse employment action. *Driggers*, 110 F. App'x at 508. Jackson suffered no benefit or pay reduction as result of the interviews, no disciplinary action was taken as a result of the interviews, and no reduction in rank or pay occurred. The circumstances surrounding the sudden appearance of the affidavit justified Jackson being interviewed regarding its submission, given its content and timing. Very simply, though the interviews might have been unpleasant, there is no evidence that Jackson suffered any job detriment whatsoever as a result.

30

While Jackson claims he was threatened prior to the interviews occurring, the threats were never carried out. His retirement was not denied him or reduced, and he was never criminally charged. Furthermore, threats are not sufficient to violate his constitutional rights. *Macko*, 760 F.2d at 97.

For the months following the interviews, nothing further was said to Jackson, and he continued his work as a road Lieutenant. He voluntarily retired after returning from hernia surgery, certainly in part to take advantage of a business opportunity that had been presented to him. The record simply does not support constructive discharge or any adverse employment action sufficient to establish a prima facie case of First Amendment speech retaliation against Rucker. Since no constitutional violation occurred, the qualified immunity inquiry ends here as well.

## 2. Political Affiliation

Jackson also contends that Rucker retaliated against him based upon his First Amendment right to political association. As discussed above, to prevail on this claim, Jackson must demonstrate the same elements as a claim for First Amendment retaliation based upon protected speech. *Sowards*, 203 F.3d at 431. Rucker also seeks summary judgment based on qualified immunity as to Jackson's political affiliation claim, which as previously explained requires the court to first consider whether a constitutional violation has occurred.

31

The court has already described the level of Jackson's political involvement and activity in its analysis of Laxton's motion for summary judgment. There is no evidence that he openly or actively campaigned for the Republican opposition to Bredesen. Rucker has stated in an affidavit that when he interviewed Jackson he did not know what his political affiliation was and did not know his political affiliation until after Jackson filed this lawsuit. Jackson has provided nothing specific to support his claim as to Rucker in his response to Rucker's motion for summary judgment. All Jackson offers is broad sweeping statements without citation to specific evidence. For example, Jackson states in his response, "There is evidence in the record, both in this case, and in Farmer's, that all defendants had a certain level of knowledge regarding the political associations of their fellow THP employees, and that it differed from that of plaintiff and Farmer, and from that of the gubernatorial administration which put defendants in charge." The evidence referred to in this statement was not specifically identified nor cited in the record. This statement and other sweeping conclusory statements regarding the Farmer case are not sufficient to counter summary judgment. "The district courts are under no duty 'to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Fuentes v. Postmaster Gen. of U.S. Postal Serv.*, 282 F. App'x 296, 300 (5th Cir. 2008) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).

The court has made it clear that it will not take judicial notice of the entire Farmer case in order to find material issues of fact for this case. Further, in responding to

a well supported motion for summary judgment, an adverse party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The Sixth "[C]ircuit has long held that '[m]ere conclusory and unsupported allegations, rooted in speculation, do not meet [the] burden'" of demonstrating that there is a genuine issue for trial. *Bell v. Ohio State Univ*., 351 F.3d 240, 253 (6th Cir. 2003) (quoting *Bryant v. Commonwealth of Kentucky*, 490 F.2d 1273, 1274 (6th Cir. 1974)).

Jackson has not presented evidence that he engaged in political association or that there is even a question of fact regarding any political association connected with Rucker's interviewing him twice. Thus, Jackson has failed to demonstrate that he engaged in protected conduct concerning political association. Accordingly, he has not made the necessary showing for the first prong of his prima facie case.

Nevertheless, even assuming for the sake of argument that Jackson has shown that he engaged in protected conduct, he cannot demonstrate that he suffered an adverse action that would deter a person of ordinary firmness. As already discussed, the interviews are not adverse employment actions. Any threats Jackson says Rucker lodged at him before the interviews are not sufficient for a § 1983 violation. After the interviews, Jackson continued his work as a road Lieutenant without suffering any loss in pay, benefits, or rank. He then retired without any disciplinary actions pending against him, and he has failed to establish constructive discharge. Thus, Jackson has failed to sustain his burden as to the second prong of his prima facie case on his claim for First Amendment retaliation based on political

association against Rucker.  The claim will be dismissed.  The court need go no further in its

qualified immunity analysis because no constitutional violation occurred.


## Conspiracy Claim

Both Rucker and Laxton have moved for summary judgment on the Jacksons'

conspiracy claim.  Lester and Nancy Jackson have alleged pursuant to 42 U.S.C. § 1985 that

Rucker and Laxton conspired to violate their constitutional rights.

To sustain a cause of action under § 1985(3)[9], a plaintiff must prove:

> (1) a conspiracy involving two or more persons (2) for the
> purpose of depriving, directly or indirectly, a person or class of
> persons of the equal protection of the laws and (3) an act in
> furtherance of the conspiracy (4) which causes injury to a person
> or property, or a deprivation of any right or privilege of a citizen
> of the United States.

*Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994) (citing *Hilliard v.*

*Ferguson*, 30 F.3d 649, 652-53 (5th Cir. 1994)).  A "plaintiff must also establish that the

conspiracy was motivated by a class-based animus." *Id*.  The Sixth Circuit has determined that

§ 1985(3) reaches "clearly defined classes, such as supporters of a political candidate."

*Cameron v. Brock*, 473 F.2d 608, 610 (6th Cir. 1973).

Rucker and Laxton contend that the intra-corporate conspiracy doctrine applies

to bar the Jacksons' conspiracy claim.  The intra-corporate conspiracy doctrine provides:

---

[9] There is no allegation or indication that any other provision of § 1985 applies in this case.

It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.

*Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991) (quoting *Nelson Radio & Supply Co., Inc. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952)); *see also Johnson*, 40 F.3d at 839-40. The doctrine also applies to governmental entities. *Edmonds v. Dillin*, 485 F. Supp. 722, 729 (N.D. Ohio 1980); *Ashiegbu v. Purviance*, 76 F. Supp. 2d 824, 830 (S.D. Ohio 1998) (citing *Brace v. Ohio State Univ.*, 866 F. Supp. 1069, 1075 (S.D. Ohio 1994)).

The Sixth Circuit has recognized the "scope of employment" exception to the intra-corporate conspiracy doctrine. That exception "recognizes a distinction between collaborative acts done in pursuit of an employer's business and private acts done by persons who happen to work at the same place." *Johnson*, 40 F.3d at 840. The Court in *Johnson* held "that when employees act outside the course of their employment, they and the corporation may form a conspiracy under 42 U.S.C. § 1985(3)." *Id*. at 841.

Initially, the court finds that the conspiracy claim fails because the Jacksons cannot show the required class-based animus. The record is void of any evidence that Nancy Jackson engaged in protected political association. As discussed above, Lester Jackson has not demonstrated that he engaged in political activity in support of Bredesen's opponent or that if he did such activity was sufficiently known to Rucker or Laxton. Without class-based

35

animus, the conspiracy claim cannot stand.

The Jacksons contend that the "scope of employment" exception to the intra-corporate conspiracy doctrine applies. However, there is no evidence that the actions about which the Jacksons complain were private acts as opposed to acts done in pursuit of the employer's business. There is no proof in the record that Laxton or Rucker sent the anonymous letter, and both defendants have affirmatively denied doing so. The Jacksons have not presented affirmative evidence to counter that positive evidence. For the above reasons, Rucker and Laxton will be granted summary judgment on the § 1985 conspiracy claim, which will be dismissed.


### Lester Jackson's Loss of Consortium Claim

Lester Jackson has also asserted a loss of consortium claim. However, Jackson "cannot state a claim for loss of consortium due to any alleged violation of [his wife's] civil rights under Section 1983." *Cross v. City of Chattanooga*, No. 1:04CV108, 2005 WL 2456977, at *11 (E.D. Tenn. Oct. 3, 2005).[10] This claim will be dismissed.

---

[10] See also the court's discussion of this issue in the memorandum opinion dismissing Nancy Jackson's loss of consortium claim [doc. 33].

Accordingly, for the foregoing reasons, the motions for summary judgment filed by Rucker and Laxton will be granted, and this civil action will be dismissed. An order consistent with this opinion will be entered.

ENTER:

        s/ Leon Jordan       
United States District Judge